**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| JONATHAN RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 24-0738 (ABJ) |
| | ) | |
| CARLOS DEL TORO, | ) | |
| Secretary of the Navy, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Plaintiff Jonathan Rodriguez is a former member of the United States Marine Corps, a branch of the military operating under the leadership of the Secretary of the Navy.  He has brought this case under the Administrative Procedure Act ("APA") to challenge decisions made by the Navy related to his disabilities, in particular, the classification code used for his separation and his ability to receive disability retirement pay.  Pending before the Court are the parties' cross-motions for summary judgment and defendant's motion to dismiss in part for lack of subject matter jurisdiction.  After reviewing the record in accordance with the deferential standard that applies to the review of military decisions, the Court will grant defendant's motion to dismiss in part on jurisdictional grounds and its motion for summary judgment on all counts.  In light of that ruling, the Court will deny plaintiff's cross motion for summary judgment on the corresponding counts.

1

## BACKGROUND

I.    **Governing Law and Regulations**

    **A.  Disability Retirement in the United States Navy**

Title 10 of the United States Code, Section 1201 governs the retirement and separation of members of the military due to disability.  The Secretary of Defense and the secretaries of each service branch have promulgated regulations to implement the statutory requirements.  *See* 10 U.S.C. § 1216; 10 U.S.C. § 1201(a).

The Secretary may place a member on the Permanent Disability Retired List if several conditions are met: 1) "based upon accepted medical principles," the member must have a disability which is "of a permanent nature and stable;" 2) "the disability is not the result of the member's intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence;" and 3) "the disability is at least 30 percent under the standard schedule of rating disabilities" ("Disabilities Rating Schedule") in use by the Department of Veterans Affairs ("VA") at the time of the determination, or the member has at least 20 years of service.  *See* 10 U.S.C. § 1201(b).  Also, if a service member has a disability rated at least 30 percent under the Disabilities Rating Schedule, one of four conditions must be satisfied: (1) the member had at least eight years of service and the disability was not "noted at the time of the member's entrance on active duty;" (2) the disability was the "proximate result of performing active duty;" (3) the disability was "incurred in line of duty in time of war or national emergency"; or (4) the disability was "incurred in line of duty after September 14, 1978."  *Id.* at § 1201(b)(3)(B)(i)–(iv).

The Department of Defense's ("DoD") Disability Evaluation System ("DES") sets out the process for reviewing a service member's medical conditions and determining whether those conditions render that service member unfit for duty.  *See* Department Directive 1332.18,

Separation or Retirement for Physical Disability (Nov. 4, 1996), https://www.rand.org/content/dam/rand/www/external/paf/projects/dopma-ropma/DODD-1332-18p.pdf[1]; Department Instruction 1332.38, Physical Disability Evaluation (Nov. 14, 1996), https://palmcenterlegacy.org/wp-content/uploads/2019/03/DoD_Number_1332.38.pdf; *see also* SECNAVINST 1850.4E encl. (8), § 8001(a), https://www.secnav.navy.mil/mra/CORB/Documents/SECNAVINST-1850-4E.PDF.  In the case of a member of the Navy or the Marine Corps, the DES process begins with a medical evaluation board, *see* Department Instruction 1332.38, E3.P1.1.1; SECNAVINST 1850.4E encl. (3), § 3102(a), followed, if necessary, by a physical evaluation board, *see* Department Instruction 1332.38, E3.P1.1.2; SECNAVINST 1850.4E encl. (3), § 3102(c), which makes a determination of fitness to continue naval service "on behalf of the Secretary of the Navy . . . ."  SECNAVINST 1850.4E encl. (1), § 1004(a).

The Navy has implemented the DES and established its own policies and procedures.  *See, e.g.*, SECNAVINST 1850.4E, Navy Disability Evaluation Manual  (April 30, 2002); U.S. Navy MANMED, Ch. 18 – Medical Evaluation Boards (January 10, 2005), https://www.med.navy.mil/Portals/62/Documents/BUMED/Directives/MANMED/MANMED%20Chapter%2018%20Medical%20Evaluation%20Boards%20(Change%20120%20-%20Complete%20Revision%2010%20Jan%202005).pdf?ver=bi9uM8KYr0cJWTb9Lzbcqw%3D%3D.  Under those directives, a medical evaluation board will refer a service member with a disability that "call[s] into question" their fitness for continued naval service to the physical evaluation board.  *See generally* MANMED, Ch. 18, Art. 18-11, at 41.  The physical evaluation board then performs most of the DES functions, such as deciding the member's fitness and

---

[1]    The citations to DOD and service-specific authorities in this opinion will refer to the versions in effect when plaintiff separated from the Navy.

entitlement to disability benefits. *See* SECNAVINST 1850.4E. The physical evaluation board has the exclusive authority to determine a service member's fitness for continued service. *See* MANMED, Ch. 18, Article 18-11, at 41.

A service member is unfit for continued service if they cannot "reasonably perform" their duties because of a physical disability. *See* SECNAVINST 1850.4E § 3302. To assess this question, the physical evaluation board will consider such factors as the ability to perform common military tasks, physical fitness, deployability, and any loss of a special qualification caused by medical conditions. *Id.* § 3304. The physical evaluation board considers "all relevant evidence," including the "circumstances of referral" to the board. *Id.* § 3303. For example, a serious injury, grave illness, or chronic impairment that prompted a service member's referral to the physical evaluation board can weigh in favor of a finding that the service member is unfit. *See id.*

If the service member adequately performed their duties until the time they were referred to the physical evaluation board, that member may be "considered Fit even though medical evidence indicates questionable physical ability to continue to perform duty." *See* SECNAVINST 1850.4E § 3303(c). On the other hand, "inadequate performance of duty, by itself, shall not be considered as evidence of unfitness due to physical disability unless it is established that there is a cause and effect relationship between the two factors." *Id.* § 3303(d). The physical evaluation board determines a service member's fitness for continued naval service by preponderance of the evidence. *Id.* §§ 2070, 3306.

If the physical evaluation board finds a service member unfit for continued naval service, it then determines the disability rating and the type of disability benefits that should be granted. MANMED, Ch. 18, Article 18-11 at 41.

### B. Regulations Applicable to the Marine Corps Reserve

This case arose from plaintiff's service in the Marine Corps Reserve. At the time of his separation, the Marine Corps Reserve Administrative Management Manual categorized injured reservists in two groups, depending on how long the Reservist was expected to be not physically qualified: (1) Temporary Not Physically Qualified, if "the Marine is clearly not physically qualified to perform [active duty] or [inactive duty for training] due to a non-service connected condition"; and (2) Not Physically Qualified, "if the Temporary Not Physically Qualified status went on for six months where a request for retention was submitted through the chain of command with medical evaluations, preferably by military providers." Marine Corps Order ("MCO") P1001R.1G § 3105, ¶ 7.

### C. The Board of Correction of Naval Records

Pursuant to 10 U.S.C. § 1552(a)(1), "[t]he Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." In most circumstances, "such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department." *Id.* Based on this statutory authority, the Secretary of the Navy established the Board for Correction of Naval Records (the "Board") to oversee the "correction of naval and marine records," and promulgated regulations found in Title 32 of the Code of Federal Regulations to govern correction proceedings. *See* 32 C.F.R. §§ 723.1–723.2.

The Board's "function is to consider applications properly before it for the purpose of determining the existence of error or injustice in the naval records . . . , to make recommendations to the Secretary or to take corrective action on the Secretary's behalf when authorized." 32 C.F.R. § 723.2(b). The Board has the delegated authority to take final corrective action on behalf of the

5

Secretary for certain naval records, but it must forward its recommendations to the Secretary when (1) "[c]omments by a proper naval authority are inconsistent with the Board's recommendation," (2) "[t]he Board's recommendation is not unanimous," or (3) "[i]t is in the category of petitions reserved for decision by the Secretary of the Navy." *Id.* § 723.6(e)(1); *see id.* § 723.7(a). Categories of petitions that are reserved for decision by the Secretary include: (1) "[p]etitions involving records previously reviewed or acted upon by the Secretary wherein the operative facts remained substantially the same," and (2) "[s]uch other petitions, as, in the determination of Office of the Secretary or the Executive Director, warrant Secretarial review." *Id.* § 723.6(e)(2).

Once a Board record is forwarded to the Secretary of the Navy for final action, the Secretary may grant or deny relief, or the Secretary may return the record to the Board for further consideration. *Id.* § 723.7(a). If the Secretary decides to deny relief, the "decision shall be in writing and, unless he or she expressly adopts in whole or in part the findings, conclusions and recommendations of the Board, or a minority report, shall include a brief statement of the grounds for denial." *Id.*; *see also id.* § 723.3(e)(4) (describing what is necessary for a "brief statement of the grounds for denial").

After a final decision is reached, a petitioner may seek reconsideration of the decision. *See* 32 C.F.R. § 723.9. "[F]urther consideration will be granted only upon presentation by the applicant of new and material evidence or other matter not previously considered by the Board." *Id.* "If such evidence or other matter has been submitted, the request shall be forwarded to the Board for a decision." *Id.*

II.      **Factual Background**

A.  **Plaintiff's Naval Service**

In early January 2003, plaintiff was serving as a member of the United States Marine Corps Reserve.  Complaint [Dkt. # 1] ("Compl.") ¶ 6.  Within his unit, he served as an Antitank Missileman, Military Occupational Specialty ("MOS") 0352.  Compl. ¶ 7.  On January 14, 2003, plaintiff, together with his unit, was involuntarily ordered to active duty in support of Operation Iraqi Freedom.  Compl. ¶ 12.  He served on active duty from January 14, 2003 until December 9, 2003, when his entire unit was deactivated.  Compl. ¶ 13.  During his combat service, plaintiff witnessed physical suffering, including the death and disfigurement of Iraqis.  Compl. ¶¶ 14–15.  At times, he feared for his life and endured intense shock.  Compl. ¶¶ 16–17.

In May 2003, while he was still in Iraq, plaintiff was involved in an accident.  Compl. ¶ 18.  While his military vehicle was stopped, a light armored vehicle traveling at approximately 45 miles per hour struck his vehicle from behind.  Compl. ¶¶ 19–20.  Plaintiff sustained a serious lower back injury as a result of the accident, and he was seen on several occasions by military medical providers.  Compl. ¶¶ 22–23.  On June 4, 2003, plaintiff reported to a military health clinic complaining of neck and lower back pain.  Compl. ¶¶ 24–25.  When he returned to the clinic with the same complaint on June 18, 2003, he was referred to physical therapy and completed a total of 12 sessions.  Compl. ¶¶ 25–26.  But his pain did not improve.  Compl. ¶ 27.  After several more visits to the doctor, plaintiff was referred for an MRI of his lower back on November 17, 2003.  Compl. ¶¶ 28–33.  The MRI revealed that he was suffering from a bulging disc, Compl. ¶ 34, and in December 2003, his doctor referred him to a pain clinic.  Compl. ¶ 36.

Plaintiff alleges that between May 2003 and December 2003, he experienced consistent and unrelenting chronic back pain and spasms.  Compl. ¶¶ 28–33.  According to him, this rendered

7

him unable to perform his Military Occupational Specialty duties, which among other physical demands, required lifting weapons systems weighing up to 65 pounds. Compl. ¶ 40. At an appointment on December 5, 2003, plaintiff's doctor recommended that if the lower back injury continued to prevent him from performing his duties, he should be administratively discharged. Compl. ¶ 41. But four days after the visit, on December 9, 2003, plaintiff's unit was deactivated. Compl. ¶ 42. Following his release from active duty, plaintiff returned to drill status with the Marine Corps Reserve, although he was still dealing with pain from his lower back injury. Compl. ¶¶ 44–45.

On April 29, 2004, plaintiff was placed on Temporarily Not Physically Qualified ("TNPQ") status, precluding his participation as a drilling reservist, unless and until a civilian evaluation found him fit for duty with no limitations. Compl. ¶ 46. In July 2004, the VA categorized plaintiff's disability as service-connected lumbar disc disease, with an evaluation of 10 percent, effective December 10, 2003. Compl. ¶ 47. Almost a year later, on April 5, 2005, plaintiff was found unfit for continued service due to his chronic back pain, and he was discharged from the Marine Corps Reserve. Compl. ¶ 48.

The narrative section of the discharge form ("DD Form 214") identifies "disability" as the "reason for separation." Compl. ¶ 49. Plaintiff alleges that during this time, while his "lower back pain was more visible and more acute," he was also beginning to suffer from post-traumatic stress disorder ("PTSD") "because of his combat experiences." Compl. ¶ 52. He asserts that after his discharge, he struggled with sustaining relationships with family and friends, experienced mood swings and flashbacks, abused alcohol, and had difficulties maintaining steady employment – all of which he attributes to PTSD. Compl. ¶¶ 53–57.

8

In 2006 and 2007, plaintiff worked as a DoD civilian contractor, and he was responsible for supervising static security guards in Iraq.  Compl. ¶¶ 58–59.  According to plaintiff, he never left base while serving in this role.  Compl. ¶ 59.  In 2011, he earned his bachelor's degree in economics, but he could not find a job for over a year after graduating, which he asserts was primarily due to the psychological challenges stemming from PTSD.  Compl. ¶ 61.  In October of that same year, plaintiff qualified for the Homeless Veterans Supported Employment Program.  Compl. ¶ 62.  On April 9, 2012, seven years after his discharge from the Marine Corps Reserve, plaintiff was diagnosed by the VA with service-connected PTSD, evaluated at 50 percent.  Compl. ¶ 63.

### B.  Plaintiff's First Request to the Board

On October 17, 2014, plaintiff applied to the Naval Corrections Board seeking an updated DD Form 214 with several corrections, including: 1) an active duty service discharge date of April 5, 2005; 2) a change on block 25 of the form to read "MARCORSEPMAN 8201"; 3) a change on block 26 of the form to substitute a separation code that indicates separation from the military with entitlement to severance and/or disability retirement pay; 4) a change on block 27 of the form to reflect a reentry code showing separation from the military with entitlement to severance and/or disability retirement pay; 5) and a change on block 28 of the form to read "Disability Incurred in the Line of Duty."  Administrative Record [Dkt. # 10] ("A.R.") A.R. 269–87; Compl. ¶ 64. Plaintiff also sought retroactive disability compensation from the date of his discharge to the date of the submission, and the issuance of retirement pay beginning  on his requested date of separation – April 5, 2005 – and continuing in perpetuity.  A.R. 269–87; Compl. ¶ 64.  After considering plaintiff's application together with the supporting evidence and applicable statutes and

regulations, on February 16, 2016, the Board denied plaintiff's requests for relief.  A.R. at 262–63; Compl. ¶ 65.

### C.  Plaintiff's Second Request to the Board

On February 16, 2017, plaintiff submitted an application for reconsideration, arguing that in determining whether he was eligible for disability retirement in connection with his deployment to Iraq, the Board should have considered his post-service diagnosis of PTSD, evaluated by the VA at 50 percent.  A.R. 132–38; Compl. ¶¶ 66–67.  Plaintiff also maintained that in accordance with the Marine Corps Separation and Retirement Manual, MCO 1900.16, ¶ 8003.15, he should have been extended on active duty in December 2003 to evaluate and document his chronic back pain and referred to the Disability Evaluation System ("DES").  A.R. 132; Compl. ¶ 68.  Finally, he took the position that he should be placed on the Permanent Disability Retired List ("PDRL") due to both his service-connected back injury and PTSD, and that his separation code should reflect that transfer.  A.R. at 132–33; Compl. ¶¶ 69–70.

In January 2018, the Board received two advisory opinions – one from the senior medical advisor of the Secretary of the Navy Council of Review Boards, and another from the Director, Secretary of the Navy Council of Review Boards.  A.R. at 125–28; Compl. ¶ 73.  The senior medical advisor's opinion noted that the "available evidence appeared insufficient to support the request" for disability status.  A.R. at 125 (opining that a "[r]eview of the treatment record [did] not demonstrate objective pathology for the back pain", that when plaintiff was seen by providers during active duty, "[i]maging revealed some foraminal encroachment but no nerve root compression," and that [t]here [was] no available record contemporary with the applicant's active service documenting the diagnosis or treatment of any mental health condition").  And the Director found in his opinion that "[t]he evidence [did] not support [plaintiff's] petition for a disability

10

retirement . . . . Though persistent, it is not clear his Back Pain impaired his duty performance.  In point of fact he was accepted back into his reserve unit.  Additionally, . . . medical providers appear to have viewed his persistent back pain as mild and did not determine the back issues warranted a PEB referral."  A.R. 128; Compl. ¶ 74.  The Director further stated that, "[w]ith respect to Post Traumatic Stress Disorder . . . [h]ad referral to the Physical Evaluation Board occurred at discharge, a finding of fit to continue naval service would have been the likely result in accord with the regulations in effect at that time."  A.R. 128; Compl. ¶ 75.

On February 26, 2018, plaintiff submitted a rebuttal to those opinions.  A.R. at 143–46; Compl. ¶ 76.  He asserted that he was separated from the Marine Corps Reserve on April 5, 2005 under the authority of MCO P1900.16F, ¶ 8402, "Disability Discharge Without Severance Pay," which states that "[a] Marine who incurs a physical disability that, in the determination of the Secretary of the Navy, renders the Marine Unfit to perform the duties of office, grade, or MOS and which results from the Marine's intentional misconduct or willful neglect or which was incurred during a period of unauthorized absence, shall be separated from the Marine Corps without entitlement to benefits per 10 U.S.C. chapter 61."  A.R. at 143; Compl. ¶ 77.  Because plaintiff's disability did not result from "intentional misconduct or willful neglect," nor was it "incurred during a period of unauthorized absence," he contended that he was entitled to benefits. A.R. at 143; Compl. ¶ 78.

Plaintiff reiterated that prior to his release from active duty on December 5, 2003, his doctor indicated that he suffered from chronic back pain that prevented him from lifting heavy objects and recommended an administrative discharge if the pain precluded him from performing his duties.  A.R. at 143; Compl. ¶ 81.  And he argued that the subsequent placement in Temporarily Not Physically Qualified status due to chronic back pain reinforces the conclusion that he should

have been retained on active duty in order to evaluate his fitness. A.R. at 144; Compl. ¶ 81. Finally, plaintiff responded to the Director's argument that he was not suffering from PTSD at the time of his service by pointing out that the Navy was required to perform a post-deployment health assessment within 30 days of a service member's return from combat deployment to identify mental health concerns, and that was never done. A.R. at 143; Compl. ¶ 82.

On March 15, 2018, the Board again denied plaintiff's request for relief, noting that it substantially concurred with the advisory opinions. A.R. at 123–24; Compl. ¶¶ 83–84. Specifically, the Board found that plaintiff was not unfit for continued naval service prior to his release from active duty in December 2003. A.R. at 123; Compl. ¶ 85.

With respect to plaintiff's back, the Board noted that plaintiff was not placed on Temporarily Not Physically Qualified status until April 2004, almost four months after being released from active service, and that the VA issued the 10 percent disability rating for his back injury in July 2004. A.R. 123; Compl. ¶¶ 86–87. Finally, the Board found that despite a finding by the Navy Bureau of Medicine and Surgery ("BUMED") that plaintiff was not medically qualified for retention in the Marine Corps Reserve due to his condition, he was employed in a combat zone for 15 months shortly after his release. A.R. 124; Compl. ¶ 88.

With respect to plaintiff's PTSD disability claim, the Board found there was insufficient evidence to support a finding that PTSD was present to a disabling degree at the time of plaintiff's separation given his decision to enter a combat zone on two separate occasions in 2006 and 2007 and his ability to complete a degree in economics in 2011. A.R. 124; Compl. ¶¶ 90–93.

### III.    Procedural Background

On March 14, 2024, plaintiff filed a four-count complaint challenging the Board's March 15, 2018 decision denying his application for reconsideration:

- **Count One** alleges that the Board ignored non-frivolous arguments. Compl. ¶¶ 98–110.

- **Count Two** alleges that the Board reached a decision contrary to law and regulation. Compl. ¶¶ 111–46.

- **Count Three** alleges that the Board failed to correct injustice clearly present in the record. Compl. ¶¶ 147–64.

- **Count Four** alleges that the Board's decision was unsupported by substantial evidence. Compl. ¶¶ 165–213.

In his prayer for relief, plaintiff asks the Court to set aside the Board's decision on reconsideration as arbitrary, capricious, contrary to law and regulation, and unsupported by substantial evidence. Compl. at 30–31. He also asks the Court to order the Secretary to "revise [his] separation code from JFR3 to SEJ, and place [him] on the PDRL with a disability rating of 60 [percent]." Compl. at 30. Alternatively, plaintiff requests that the Court remand to the Board for a new review. Compl. at 31.

On August 1, 2024, the Secretary moved for summary judgment on all counts and to dismiss in part for lack of subject matter jurisdiction. Def.'s Mot. for Summ. J. & for Partial Dismissal [Dkt. # 9] ("Def.'s Mot."); Mem. in Supp. of Def.'s Mot. [Dkt. # 9] ("Def.'s Mem.") at 1. Plaintiff opposed the motion and filed a cross-motion on September 9, 2024. Pl.'s Opp. to Def.'s Mot. & Cross–Mot. for Summ. J. [Dkt. ## 12–13] ("Pl.'s Cross–Mot."). Both motions are fully briefed. On November 26, 2024, defendant filed a combined opposition to plaintiff's cross-motion and reply in support of his motion for summary judgment and partial dismissal. Def.'s Opp. to Pl.'s Cross–Mot. & Reply in Further Supp. of Def.'s Mot. [Dkt. ## 17–18] ("Def.'s Cross–Opp."). And on December 17, 2024, plaintiff filed his reply in support of his cross-motion. Pl.'s Reply Mem. in Supp. of Cross–Mot. [Dkt. # 21] ("Pl.'s Cross–Reply").

13

**STANDARD OF REVIEW**

<u>Motion to Dismiss for Lack of Subject Matter Jurisdiction</u>

The party invoking the limited jurisdiction of a federal court has the burden to prove that jurisdiction is proper. *See Georgiades v. Martin–Trigona*, 729 F.2d 831, 833 n.4 (D.C. Cir. 1984). Thus, to survive a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), a plaintiff must establish the court's jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, a court may consider materials outside the pleadings to resolve the question of whether it has jurisdiction to hear the case. *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

<u>Summary Judgment</u>

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the APA, Rule 56 does not apply due to the limited role of a court in reviewing the administrative record. *Select Specialty Hosp.–Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011). Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Pres. Overton Park,*

14

*Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law." *Id.* § 706(2)(D). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision is presumed to be valid, *see Citizens to Pres. Overton Park*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a 'rational connection between the facts found and the choice made.'" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006), quoting *State Farm*, 463 U.S. at 43. Moreover, the "agency must cogently explain why it has exercised its discretion in a given manner . . . and that explanation must be sufficient to enable [a court] to conclude that the agency's action was the product of reasoned decisionmaking." *Id.*, quoting *State Farm*, 463 U.S. at 48, 52.

Decisions made by the Secretary of the Navy are reviewed under the arbitrary and capricious standard of the APA. *Turner v. Dep't of Navy*, 325 F.3d 310, 313–14 (D.C. Cir. 2003). However, decisions made by the Secretary of a service branch receive additional deference because Congress has given them wide discretion in deciding whether to make corrections to military records. *See* 10 U.S.C. § 1552(a)(1) ("The Secretary of a military department may correct any military record of the Secretary's department *when the Secretary considers it necessary* to

15

correct an error or remove an injustice . . . .") (emphasis added); *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1513–14 (D.C. Cir. 1989).  Courts must consider "whether the Secretary's decision making process was deficient, not whether [the] decision was correct."  *Kreis*, 866 F.2d at 1511.

## ANALYSIS

### I.    Plaintiff's Complaint Will Be Dismissed in Part for Lack of Jurisdiction

Defendant argues that the Court does not have subject matter jurisdiction to consider plaintiff's request that it revise his separation code from JFR3 ("disability, other") to SEJ ("disability, permanent – enhanced") as well as his request to be placed on the Permanent Disability Retired List with a disability rating of 60 percent.  *See* Def.'s Mem. at 12–13; Compl. at 30.  Plaintiff responds that the Court has the power to grant this relief because the decision "does not involve a military judgment requiring military expertise."  Pl.'s Cross–Mot. at 23, quoting *Kreis v. Secretary of the Air Force*, 406 F.3d 684, 688 (D.C. Cir. 2005).

"The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches."  *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis omitted); *see also Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953) ("The responsibility for setting up channels through which [military] grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates.").  Therefore, the D.C. Circuit has routinely found military personnel actions to be nonjusticiable.  *See, e.g.*, *Kreis*, 866 F.2d at 1514 (finding an Air Force major's claim for retroactive promotion nonjusticiable).  *See also Reilly v. Sec'y of the Navy*, 12 F. Supp. 3d 125, 140 (D.D.C. 2014) (the jurisdiction of federal courts concerning military personnel decisions is

16

"typically limited to challenges to *procedures*—it does not extend to the *merits*") (emphasis in original).

In light of those authorities, the Court finds that it does not have subject matter jurisdiction over plaintiff's request to order the Secretary to revise his separation code and place on him on the PDRL with a disability rating of 60 percent. Compl. at 30. At most, the Court could remand the matter to the Board if it finds that the Board failed to follow the APA. *See Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (finding that the district court "sits as an appellate tribunal" and has no "jurisdiction to order specific relief") (internal quotation marks and citations omitted). Plaintiff relies on the *Kreis* decision, *see* Pl's Cross–Mot. at 23, but in that case, the Circuit did not grant specific relief; rather it remanded the case to the military board for reconsideration on the merits. *See Kreis*, 406 F.3d at 688.

Plaintiff seeks to distinguish the cases cited by the defendant on the grounds that they involved promotions and reinstatement decisions, and argues that the relief he seeks is "not a task which would require this Court to '[run] the Army.'" Pl.'s Cross–Mot. at 23–24, quoting *Orloff*, 345 U.S. at 93–94. He emphasizes that he is not asking the Court to "determine promotion and retention merits, decisions which admittedly go to the heart of the military branches' special competency." Pl.'s Cross–Mot. at 24. But other courts in this district have found military personnel actions other than promotion and reinstatement actions to be nonjusticiable as well. *See, e.g.*, *Wilson v. James*, 139 F. Supp. 3d 410, 431 (D.D.C. 2015) (military personnel decisions, including discipline and discharge, are nonjusticiable); *Creaghan v. Austin*, 602 F. Supp. 3d 131, 140 (D.D.C. 2022) ("[M]ost cases involving fitness for duty are generally not justiciable, sometimes because they involve complex medical judgments, and sometimes because they involve highly subjective judgments regarding the servicemember's military capabilities."), *vacated on*

17

*other grounds*, *Navy Seal 1 v. Austin*, 2023 WL 2482927 (D.C. Cir. Mar. 10, 2023). A determination of fitness for duty appears to be the precisely the sort of military judgment requiring military expertise. *See Kreis*, 866 F.2d 1508 at 1511. Accordingly, defendant's motion to dismiss plaintiff's request that the Court revise his separation code and place him on the PDRL with a disability rating of 60 percent will be granted.

## II.     The Board's Decision to Deny Plaintiff's Application Was Not Arbitrary and Capricious

Plaintiff's claims are subject to an "unusually deferential application" of the arbitrary and capricious standard of the APA. *Kreis*, 866 F.2d at 1514; *see Piersall v. Winter*, 435 F.3d 319, 324 (D.C. Cir. 2006). The Court need only find that the Board's decision reflects "a rational connection between the facts found and the choice made." *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997) (internal quotation marks and citations omitted). This does not, however, dispense with the mandate that the Board's action "be supported by reasoned decisionmaking," *Haselwander v. McHugh*, 774 F.3d 990, 996 (D.C. Cir. 2014) (internal quotation marks and citations omitted), and that the Board must respond to all of the non-frivolous arguments that could affect the Board's ultimate disposition. *Frizelle*, 111 F. 3d at 177.

### A.  Plaintiff's Non-Frivolous Arguments Were Addressed

Plaintiff contends first that reversal is warranted because the Board ignored three non-frivolous arguments advanced in his application. Pl.'s Cross–Mot. at 25, citing A.R. at 123–24. He complains that the Board ignored his arguments that: 1) he should have received a medical extension of his active duty in order to evaluate and document his chronic back pain and to refer him in the Disability Evaluation System in accordance with the Marine Corps Separation and Retirement Manual, MCO 1900.16, ¶ 8003.15; 2) his separation under MCO P1900.16F, ¶ 8402, "Disability Discharge Without Severance Pay," was clearly erroneous because his disability did

not result from intentional misconduct or willful neglect, nor was it incurred during a period of absence or prior to his service; and 3) the Marine Corps failed to perform a post-deployment health assessment within 30 days of his return from combat to identify mental health concerns. *Id.* Defendant's position is that the contentions not explicitly addressed would not have affected the Board's ultimate disposition. Def.'s Cross–Opp. at 5–6.

Plaintiff maintains that the Board committed a procedural error when it did not take up his claim that the Navy failed to comply with the Marine Corps Separation and Retirement Manual when it did not accord him a "medical extension" upon the end of his deployment on active duty. The Manual defines the term "medical extension" as an "[e]xtension of active duty service for a maximum of 60 days to evaluate and document a Marine's condition upon the completion of active service or determine if a Marine should be retained on limited duty for possible future processing through the disability evaluation system." MCO 1900.16, ¶ 8003.15, *Separation and Retirement Manual (Short Title: MARCOSEPMAN)*, November 26, 2013, https://www.marines.mil/portals/1/publications/mco%20%201900.16.pdf. However, as plaintiff acknowledged in his reconsideration application, an extension of active duty is not required, but it "*may* be granted in order to evaluate the Marine's condition." A.R. 135 (emphasis added). *See also* MCO 1900.16, B001.18(c) ("For the purpose of reemployment rights, all extensions of service, except extensions to make good time lost (reference (a) Title 10, U.S.C. 972), are considered to be at the request and for the convenience of the Government."). And notably, the policy that plaintiff faults the service for failing to follow was not in place at the time of plaintiff's discharge. *See Separation and Retirement Manual (Short Title: MARCOSEPMAN)*, June 6, 2007, https://www.usmcu.edu/Portals/218/CEME/courses/MCO%20P1900.16F%20with%20CH%201

19

%20and%202%20SEPSMAN.pdf?ver=2018-09-24-142242-170 (excluding any definition of the term "medical extension").

In any event, the record reflects that the failure to address the claimed denial of a medical extension directly does not require a remand since the Board did consider and discuss in detail the facts and circumstances surrounding plaintiff's physical and mental state at the time of his separation. So that information was not ignored: it was simply considered in a different context, and there is no indication that addressing those facts in the context of what the extension would have uncovered would have changed the Bureau's disposition of the application.

In the advisory opinion, with which the Board "substantially concurred," Compl. ¶ 84, the senior medical advisor stated that the problem with plaintiff's back had been "relatively minor" from its inception. A.R. 126. The advisor also opined that the bulging disc seen on plaintiff's MRI was more likely to be an incidental finding, "not unfitting for continued naval service." A.R. 125–26. More importantly, the advisor found that "a diagnosis of Mechanical Back Pain at the time of release from active service in the absence of more objective evidence of neural impingement would likely have been considered a condition, not a disability, had referral to the DON [Department of Navy] PEB [Physical Evaluation Board] occurred." A.R. 126. The Board's decision to adopt the medical advisor's findings makes it highly unlikely that it would have found a medical extension advisable, much less, necessary, or that it would have accepted plaintiff's argument that further evaluation would have led to a referral into DES on the grounds that he was unfit for service. The Board has already marshaled its reasons for why it found that he was fit. Therefore, the Court will not order remand for consideration of an issue that is unlikely to change the disposition of the petition. *See Frizelle*, 111 F. 3d at 177.

Plaintiff also argues that remand is required because the Board ignored his contention that his separation was clearly erroneous under MCO P1900.16F, ¶ 8402, "Disability Discharge Without Severance Pay." That policy provides, "[a] Marine who incurs a physical disability that, in the determination of the Secretary of the Navy, renders the Marine Unfit to perform the duties of office, grade, or MOS and which results from the Marine's intentional misconduct or willful neglect or which was incurred during a period of unauthorized absence, shall be separated from the Marine Corps without entitlement to benefits per 10 U.S.C. chapter 61," and plaintiff submits that he should have been separated with benefits because his disability did not result from intentional misconduct or willful neglect, nor was it incurred during a period of absence or prior to his service. Pl.'s Cross–Mot. at 25. But the absence of disqualifying circumstances does not prove that plaintiff qualified for disability benefits. Plaintiff overlooks the Board's critical finding that his condition was not sufficiently disabling at the time of his release from active duty in December 2003 to warrant a finding that he was "unfit for continued naval service" at all. A.R. 123, 126; *see also* A.R. 263 (rejecting plaintiff's first application because "[t]here was no evidence [his] injuries were so severe to warrant a finding of unfitness"). In other words, the Board had no need to go on to the question presented in the MCO about whether plaintiff's own conduct contributed to the disability, or whether he was on active duty at the time he was injured; indeed, the Board acknowledged that plaintiff was injured while he was in service. *See* A.R. 125 (stating that plaintiff was "injured in a motor vehicle accident while transiting from Iraq to Kuwait").

Finally, plaintiff suggests that the Board erred when it ignored his argument that the Marine Corps failure to perform a required a post-deployment health assessment within 30 days of his return from combat to identify the presence of mental health conditions. Pl.'s Cross–Mot. at 25. But the Board addressed the substance of plaintiff's concern even if it did not respond to this

contention directly, and the opinion contains conclusions and the reasons supporting them which reveal that even if it considered this argument, the outcome would not have been affected. In the advisory opinion that the Board substantially adopted, the senior medical advisor stated: "both [the] service treatment and post service records do not support a claim for PTSD," and "had referral to the PEB occurred at discharge, a finding of fit to continue naval service would have been the likely result in accord with the regulations in effect at that time." A.R. 127 (cleaned up); *see also id.* at 128 (statement from the Director expressing the same view). The Board was unequivocal in its assessment that the results of a post-deployment test would not have led to a finding of unfitness in accordance with its regulations at that time, and therefore, the requested remand would serve no purpose.

In sum, while plaintiff has pointed to policies that — at least at some point — made a medical extension of active duty an option, and others that required a post-discharge evaluation, he is simply speculating that those examinations would have produced evidence in his favor. But he does not point to facts that support his prediction, while the Board points to facts that led it to the opposite view. For these reasons, while the Court does not doubt that plaintiff has in fact suffered from both real back pain and real symptoms of PTSD in the wake of his deployment to Iraq, given the standard to be employed when reviewing the military Board's decision, it cannot find that there were errors in the Board's analysis that require a remand for reconsideration of the specific points he has raised.

### III.    The Board's Decision Does Not Contravene Navy Guidance with Respect to PTSD

Plaintiff asked the Board to determine retroactively that he should have been retired as disabled due to PTSD in December of 2003, which would have made him eligible for disability benefits. Plaintiff argues that the Board's decision that PTSD did not render him unfit for

continued service at the time of his discharge from active duty in December 2003 violated the directives set forth in an August 25, 2017 Memorandum issued by the then-Undersecretary of Defense, Anthony Kurta, entitled, "Clarifying Guidance to Military Discharge Review Boards and Boards for Correction Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions . . . ." (the "Kurta Memo"). Pl.'s Cross–Mot. at 26–30, citing Kurta Memo available at: https://www.milreviewbds.mil/Portals/149/Images/documents/Kurta%20Memo_Clarifying-Guidance_08.25.2017.pdf?ver=Je_DsGzGoPiCsLhryf841Q%3D%3D.

The Kurta Memo calls for "liberal consideration" of applications for discharge relief based on mental health conditions, including requests that the Board upgrade the characterization of service or to change the narrative reason for a discharge. *See Doyon v. United States*, 58 F.4th 1235, 1237 (Fed. Cir. 2023).[2] The Memo applies to the Board's consideration of "requests by veterans for modification of their discharges due in whole or in part to mental health conditions,

---

2    The Court in *Doyon* detailed the history behind the memorandum:

> In 2014, Secretary of Defense Chuck Hagel issued guidance to correction boards regarding claims seeking to upgrade a service member's discharge characterization based on previously unrecognized PTSD. The Hagel Memo noted that, because 'PTSD was not recognized as a diagnosis at the time of service' for Vietnam veterans and because PTSD diagnoses often 'were not made until decades after service was completed,' many veterans' records lack sufficient 'substantive information' concerning PTSD.
>
> ***
>
> Like the Hagel Memo, the Kurta Memo explains that the more lenient liberal consideration evidentiary standard is appropriate for PTSD-related correction claims because '[i]t is unreasonable to expect the same level of proof for injustices committed years ago when . . . PTSD . . . w[as] far less understood than [it is] today.'

58 F.4th at 1238 (internal citations omitted).

including" PTSD and traumatic brain injury.  Kurta Memo. ¶ 1.[3]  The memorandum has since been codified at 10 U.S.C. § 1552(h).

Plaintiff argues that since his application to the Board for reconsideration was based in part on his contention that he suffered from combat-related PTSD at the time of his discharge in December 2003, the Board should have given liberal consideration to the evidence he presented concerning his work performance, relationship issues, anxiety, flashbacks, and other symptoms. He also complains that the Board failed to accord the VA's finding of a service-related PTSD disability rating of 50% the weight to which it was entitled under the Kurta Memo.

The Secretary's position is that the Board's decision was consistent with the military law. The government agrees that liberal consideration is required for "discharge relief," including a request that the Board upgrade the characterization of service or change the reason for a discharge. But it insists that the Memo is inapplicable to a separate request for a disability retirement, or, more importantly, to the statutory prerequisite for such a retirement: the determination of fitness under 10 U.S.C. § 1201(a).

The Kurta Memorandum applies to a former member of the armed forces whose claim for review of a discharge or dismissal "is based in whole or in part on matters relating to post-traumatic stress disorder or traumatic brain injury as supporting rationale, or as justification for priority consideration, and whose post-traumatic stress disorder or traumatic brain injury is related to

---

3       While the Kurta Memo had not been issued at the time plaintiff first appealed to the Board, plaintiff's application for reconsideration was pending and not yet decided as of August 25, 2017, and it was in force when the decision challenged here was rendered.  *See Doyon*, 58 F.4th at 1239 ("There is no dispute that the Hagel and Kurta Memos' guidance is binding on the BCNR."), citing *Fisher v. United States*, 402 F. 3d 1167, 1177 (Fed. Cir. 2005).

combat or military sexual trauma, as determined by the Secretary concerned." 10 U.S.C.

§ 1552(h)(1). In the case of a claimant who meets that description, the board must:

> (A) review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the claimant; and
>
> (B) review the claim with liberal consideration to the claimant that post-traumatic stress disorder or traumatic brain injury potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal.

§ 1552(h)(2). The Memo provides that the service member's testimony alone may be sufficient to

establish the existence of PTSD. Kurta Memo ¶ 7. It also includes the following guidance:

> A diagnosis made by a licensed psychiatrist or psychologist that the condition existed during military service will receive liberal consideration.
>
> A determination made by the Department of Veterans Affairs (VA) that a veteran's mental health condition, including PTSD . . . is connected to military service, while not binding on the Department of Defense, is persuasive evidence that the condition existed or experience occurred during military service.

*Id.* at ¶¶ 13, 14.

The Secretary predicates his position on 10 U.S.C. § 1201, the statutory provision

governing retirement:

> **(a)** Retirement.—
>
> Upon a determination by the Secretary concerned that a member described in subsection (c) is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay or while absent as described in subsection (c)(3), the Secretary may retire the member, with retired pay computed under section 1401 of this title, if the Secretary also makes the determinations with respect to the member and that disability specified in subsection (b).
>
> **(b)** Required Determinations of Disability.—

25

> Determinations referred to in subsection (a) are determinations by the Secretary that—
>
> **(1)** based upon accepted medical principles, the disability is of a permanent nature and stable;
>
> **(2)** the disability is not the result of the member's intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence; and
>
> **(3)**    either—
>
>> **(A)** the member has at least 20 years of service computed under section 1208 of this title; or
>>
>> **(B)** the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination; and either—
>>
>>> **(i)**    the disability was not noted at the time of the member's entrance on active duty (unless clear and unmistakable evidence demonstrates that the disability existed before the member's entrance on active duty and was not aggravated by active military service);
>>>
>>> **(ii)**    the disability is the proximate result of performing active duty;
>>>
>>> **(iii)**    the disability was incurred in line of duty in time of war or national emergency; or
>>>
>>> **(iv)**    the disability was incurred in line of duty after September 14, 1978.

10 U.S.C. § 1201. As the government reads the provision, the determination that a service member is "unfit" is the prerequisite for retirement because of *any* disability, and it is only after that determination is made that the Secretary may go on to address whether the "disability" meets the criteria set out in paragraph (b). It argues, then, that the nature of the disability – to which the Kurta Memorandum may pertain – does not enter the analysis unless the Secretary has made the

26

finding that the member is "unfit," and since the Board did not find plaintiff unfit for purposes of section 1201, the Memo is inapplicable to this case.

In the *Doyon* case, the Federal Circuit specifically differentiated the regulations governing separation from military service as "unsuitable" due to mental health disorders, from military disability retirement "on the other hand," which "is governed by 10 U.S.C. § 1201."  58 F.4th at 1239, citing *Chambers v. United States*, 417 F. 3d 1218, 1124 (Fed. Cir. 2005).  It took note of the separate procedures to be employed before a Secretary can make a determination that a service member is unfit and observed, "[s]o while some service members might be discharged from military service on 'unsuitability' grounds, other service members may instead retire from service due to disability if the Secretary of their respective military department determines that they are 'unfit' for duty."  *Doyon*, 58 F.4th at 1239.  But the case did not directly address the question of whether liberal consideration is owed or the Kurta Memo applies when a veteran is challenging a later finding that PTSD did not render him "unfit" for disability retirement purposes.

> Although this case is narrowly about correcting Mr. Doyon's military records to reflect a discharge due to PTSD instead of a personality disorder, there is a larger underlying dispute about whether Mr. Doyon was unfit, rather than unsuitable, for service at the time of his discharge from the Navy. Mr. Doyon argues that once the BCNR determines that PTSD, rather than a personality disorder, was the basis of his discharge from the Navy, he is automatically entitled to a new separation code reflecting unfitness due to physical disability, and that entitles him to medical retirement. The government disagrees, arguing that a determination that Mr. Doyon was discharged due to PTSD does not automatically mean that he was also unfit for service, which is a separate determination necessary for him to receive medical retirement. This unfitness dispute between the parties is not properly before us at this stage and can be addressed, if necessary, on remand.

*Id.* at 1248 (citations omitted).  *See also id* at 1244 ("We offer no opinion as to whether liberal consideration would entitle Mr. Doyon to a correction of his DD-214 form or to disability retirement.").

Neither side has pointed the Court to a decision – binding or otherwise – in which this question has been addressed. On April 4, 2024, the Acting Under Secretary of Defense, Ashish S. Vazirani issued a Memorandum ("Vazirani Memo") announcing that "[i]t is DoD policy that the application of liberal consideration does not apply to fitness determinations." Vazirani Memo at 1–2, https://www.secnav.navy.mil/mra/bcnr/Documents/Vazirani%20Memo%20(Liberal%20Consideration%20and%20Fitness%20Determinations).pdf. This guidance was not issued until after the Board issued its 2018 decision in plaintiff's case, and therefore, it will not play a role in the Court's review of the Board's decision.

But the fact that the Navy has now spoken on this matter of military policy cautions against this Court's stepping in to consider, as a matter of first impression, whether liberal consideration should have been applied when the Board was being asked to make a fitness determination in connection with retirement with a disability under 10 U.S.C. § 1201(a). The Vazirani Memo, like the *Doyon* court, read the Kurta Memo and section 1522(h) broadly to reiterate that Boards of Correction of Military or Naval Records should apply liberal consideration to an eligible applicant's assertion that combat-related PTSD "potentially contributed to the circumstances resulting in their discharge or dismissal to determine whether any discharge relief, such as an upgrade or change to the narrative reason for discharge, is appropriate." Vazirani Memo at 1. However, the Memo characterized a claim of medical unfitness due to that PTSD as a "discreet issue" not subject to liberal consideration; "any request for a medical retirement or separation necessarily asserts the existence of an error or injustice in the previous *failure* of the Service to discharge the individual for unfitness, rather than in the circumstances of an individual's actual discharge or dismissal." *Id.* at 1–2.

Here the plaintiff was in fact discharged and retired due to his back pain, but he asked the Board to revise that approximately eleven years later to reflect a discharge due to PTSD: in other words, to fault the Service for failing to find that he was unfit due to PTSD at a time when it was not being asked to do so.  Even if the Court were to find that the Kurta Memo should play some role in that analysis, it would require the reviewer to look back at the records from the time to see if what we now know to be symptoms of PTSD were overlooked or misunderstood – for instance, whether a service member's anti-social behavior or abuse of alcohol was misunderstood, and he was discharged for the wrong reasons.  *See* Kurta Memo ¶ 6 (stating "[e]vidence of misconduct, including any misconduct underlying a veteran's discharge, may be evidence of a mental health

condition"). But in this case, plaintiff complained of physical pain and that was why he was discharged.[4]

---

4 At bottom, this case appears to fall somewhat outside the paradigm contemplated by the guidance at issue. The Hagel Memorandum was published at a time when Vietnam veterans were seeking to correct military records and upgrade less than honorable or punitive discharges with evidence of PTSD. *See* https://www.secnav.navy.mil/mra/bcnr/Documents/HagelMemo.pdf. The disorder was not recognized at the time of their service, and the diagnoses were made years later. The Memo was designed, then, to address the difficulty veterans were experiencing when attempting "to document conditions that form a basis for mitigation in punitive, administrative, or other legal actions to establish a nexus between PTSD and the misconduct underlying the Service member's discharge with a characterization of under other than honorable conditions." Hagel Memo. at 1. With that in mind, the Memo announced a new approach:

> In cases where Service records or any document from the period of service substantiate the existence of one or more symptoms of what is now recognized as PTSD or a PTSD-related condition during the time of service, liberal consideration will be given to a finding that PTSD existed at the time of service.

*Id.*, Attachment at 1. Liberal consideration was also to be accorded in cases "where civilian providers confer diagnoses of PTSD or PTSD-related conditions, when case records contain narratives that support symptomatology at the time of service, or when any other evidence which may reasonably indicate that PTSD or a PTSD-related disorder existed at the time of discharge which might have mitigated the misconduct that caused the under other than honorable conditions characterization of service." *Id.* The point was to rectify the sanctions or denial of benefits, and to remove the stigma, that had been based on conduct that was simply not understood at the time.

The later Kurta Memo had broader application. *See Doyon*, 58 F.4th at 1238 (observing that unlike the Hagel Memo, which was focused on "'petitions for changes in characterization of service'—e.g., changing a service member's discharge from dishonorable or less-than-honorable to honorable, . . . the Kurta Memo's guidance is not limited to discharge characterization upgrades and applies to 'any petition seeking discharge relief including requests to change the narrative reason, re-enlistment codes, and upgrades from General to Honorable characterizations.'"). But the guidance also emphasized the need for relief to correct record entries based on misconduct that in hindsight, can be explained by PTSD or other mental health conditions. *See, e.g.*, Kurta Memo ¶ 26(k) ("Liberal consideration does not mandate an upgrade. Relief may be appropriate, however, for minor misconduct associated with mental health conditions, including PTSD . . . and some significant misconduct sufficiently justified or outweighed by the facts and circumstances."). And the evidence it directed the Board to consider was largely tied to that objective. *See id.* ¶ 9 ("[A] diagnosis rendered by a licensed psychiatrist or psychologist is evidence that the veteran had a condition that may excuse or mitigate the discharge.").

In any event, the Court need not determine whether the Kurta Memo should have governed the Board's determination on reconsideration, because even if it did, the result would have been the same.

Plaintiff argues that in accordance with the guidance in the Kurta Memo, the VA's 2012 diagnosis of service-related PTSD warrants a retroactive determination that he was unfit in December of 2003. *See* Pl.'s Cross–Mot. at 29. His core contention is that the Board gave too little weight to the VA's determination of a 50% PTSD disability rating, contrary to the guidance in the Memo that "[a] determination made by the Department of Veterans Affairs (VA) that a veteran's mental health condition, including PTSD . . . is connected to military service, while not binding on the Department of Defense, is persuasive evidence that the condition existed or experience occurred during military service." Kurta Memo ¶ 14. The problem plaintiff faces in this case is that even if one accords liberal consideration and substantial weight to the VA's April 2012 determination that he suffered from "service connected" PTSD, and one takes all of plaintiff's reports of the personal problems and symptoms he experienced as true and consistent with the diagnosis, none of that goes to the determination he asked the Board to make: whether he was rendered unfit by PTSD *at the time of his discharge*.

The Kurta Memo advises that evidence of the existence of PTSD at the time of discharge may include "changes in behavior; requests for transfer to another military duty assignment, deterioration in work performance; inability of the individual to conform their behavior to the expectations of a military environment; substance abuse; episodes of depression, panic attacks, or anxiety without an identifiable cause; unexplained economic or social behavior changes; relationship issues; or sexual dysfunction." Kurta Memo ¶ 5. However, plaintiff has not pointed to evidence of any symptoms experienced before discharge that were ignored or downplayed, or

31

adjustment, emotional, or behavioral problems which should be reconsidered through the more sophisticated and compassionate lens of the Kurta Memo. As the government points out, both the Hagel and Kurta Memos anticipate that there will be consideration of contemporaneous records, *see* Hagel Memo, Attachment at 1 ("Conditions documented in the record that can reasonably be determined to have existed at the time of discharge will be considered to have existed at the time of discharge."); A.R. 169 ("In cases where Service records or any document from the period of service substantiate the existence of one or more symptoms of what is now recognized as PTSD or a PTSD-related condition during the time of service, liberal consideration will be given to finding that PTSD existed at the time of service."); and Kurta Memo at ¶ 2.b (one of the four questions typically involved in requests for relief is, "[d]id that condition exist/experience occur during military service?"), and plaintiff does not point to any records that preceded his discharge. Indeed, plaintiff's own complaint does not describe his experiencing any symptoms until after he was discharged for chronic back pain in April of 2005. *See* Compl. ¶ 52 ("Additionally, during this time, while Mr. Rodriquez's lower back pain was more visible and more acute, he was also *beginning to* suffer from PTSD because of his combat experiences.") (emphasis added) and ¶¶ 53–62 (describing events and "sign[s] of PTSD" occurring after his discharge).

Moreover, the VA's April 9, 2012 Rating Decision, which plaintiff contends would have produced a different outcome had the Board accorded it the significant weight to which it was entitled, says little or nothing about plaintiff's mental health status prior to his discharge, much less, anything that compels a finding that he was unfit at the time. *See* A.R. 323–25. It is notable that the evidence the VA had before it when rendering its decision included "[s]ervice treatment records for the period of service from June 18, 2002 to December 6, 2002 and from January 14, 2003 to April 5, 2005." A.R. 323. So the VA had that material to consider in conjunction with

the medical evidence from the post-discharge visits to the Miami VA Medical Center ("VAMC") for the period from March 19, 2024 through April 2, 2012.

In the portion of the decision entitled, "What We Decided," the VA wrote, "[w]e determined that the following condition was related to your military service, so service connection has been granted." A.R. 324. The condition was post-traumatic stress disorder, 50%. But the decision does not state or suggest that the plaintiff was struggling with that condition in 2003, and the symptoms it itemizes in support of its rating relate to plaintiff's reported adjustment problems after his discharge and the information in the Miami VAMC records. For example, the VA rating refers to "difficulties in adapting to stressful circumstances; the examiner's assessment of your current mental functioning . . . ; disturbances of motivation and mood; flattened affect; . . . anxiety; chronic sleep impairment; depressed mood; suspiciousness." A.R. 325 (cleaned up). The VA was unequivocal that plaintiff was in fact experiencing symptoms stemming from of his combat experience, but the remainder of its decision does little to compel a finding by the Board that plaintiff was unfit for duty at that time or earlier: "[y]our Global Assessment of Function (GAF) score is 60. A range of 51-60 indicates moderate symptoms; or any moderate difficulty in social, occupational, or school functioning." A.R. 325. The VA advised that "[a] higher evaluation . . . is not warranted unless there is occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; . . . near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control . . . ; . . . neglect of personal appearance and hygiene;" etc. A.R. 325 (cleaned up). This is not inconsistent with the Board's ultimate determination.

The record reflects that the Board did not give the VA opinion short-shrift, or second-guess it; it simply assessed its evidentiary value in connection with the decision it was being asked to make: was plaintiff disabled by PTSD at the time of his discharge?  It accepted the Rating Decision – which looked backwards to attribute plaintiff's ongoing struggles to his combat experience but did not rely upon records or history that recounted problems experienced while in the military – and went on to view that diagnosis in the context of other evidence that bore on the extent to which his condition rendered him unfit for duty:

> [A]ny PTSD symptoms you may have been experiencing in December 2003 did not prevent you from continuing your duties in the Marine Corps Reserve.  Most convincing to the Board was your willingness to enter a combat zone on two occasions, in 2006 and 2007 . . . . Further, the Board noted that you completed a degree in Economics in 2011.  So despite a VA PTSD rating of 50% from 2012, the Board felt there was strong objective evidence that you were fully capable of performing your duties in December 2003 based on your post-separation accomplishments, regardless of the challenges you experienced in completing them.

A.R. 124.  And as previously noted, in making its decision, the Board considered the opinion of the Senior Medical Advisor to that effect.  A.R. 123.  Plaintiff takes issue with where the Board came out after undertaking its assessment, but the operative question is "whether the Secretary's decision making process was deficient," *see Kreis*, 866 F.2d at 1511, and that has not been shown.

Therefore, after consideration of the entire record, the Court finds that plaintiff has not shown that the Board's decision on reconsideration contravened the binding guidance contained in the Kurta Memo.

## IV.     The Board Made a Rational Connection Between the Facts Found and the Decision Made

Plaintiff argues that the Board's determination that his back injury and PTSD did not render him unfit for continued naval service in December 2003 was "unsupported by substantial evidence."  Pl.'s Cross–Mot. at 30.  In his view, the Board "offered *non sequitur* explanations for

34

its findings, and its decision was not supported by a 'rational connection between the facts found and the choice made.'" *Id.*, citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); *Frizelle*, 111 F.3d at 176. Defendant takes the position that the Board's decision was based on material in the record, including medical opinions, VA ratings, and plaintiff's actions following discharge, and the plaintiff has not made the showing needed to warrant a reversal. Def.'s Cross–Opp. at 7–8.

Factual findings made by military boards must be supported by "substantial evidence." *Clinton v. Goldsmith*, 526 U.S. 529, 539 (1999). When applying this standard of review, the factual findings of a board must be overturned when a reasonable factfinder would be compelled by the evidentiary record to find to the contrary. *See Finberg v. United States Dep't of Agric.*, 6 F.4th 1332, 1338 (D.C. Cir. 2021), citing *Orion USARs Ltd. v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence," *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966), but the finding must "includ[e] a 'rational connection between the facts found and the choice made.'" *Alpharma*, 460 F.3d at 6, quoting *State Farm*, 463 U.S. at 43.

With respect to his back injury, plaintiff maintains that the evidence cited by the Board did not support its determination that he was not unfit for continued naval service prior to his release from active duty in December 2003. The Board concurred with the senior medical advisor's opinion, concluding that "[d]espite medical evidence that you were suffering from symptoms of pack pain related to a disc in your lower back," there was "insufficient evidence to conclude that you were unable to perform the duties of your office, grade, rank or rating at the time of your release from active duty." A.R. 123. And it pointed to three factors that supported its conclusion.

35

First, the Board took note of the fact that plaintiff was not placed in Temporary Not Physically Qualified ("TNPQ") status until April of 2024, four months *after* he was released from active service.  Second, it observed that the VA's July 2004 Rating Decision, *see* A.R. 309–10, rated his disability due to service-connected lumbar disc disease as of December 2003 at only 10%.[5]  It stated, "[w]hile VA ratings are not dispositive evidence of fitness for continued naval service, the Board considered the relatively low disability rating issued by the VA as additional evidence that your condition was not a debilitating disability in 2003."  A.R. 124.  Finally, the decision reports that that "despite a finding by [the Navy Bureau of Medicine and Surgery] that you were not medically qualified for retention in the Marine Corps Reserve due to your condition, the Board noted that you were employed in a combat zone for 15 months shortly after your release from the Marine Corps Reserve."  A.R. 124.  According to the Executive Director of the Board for Correction of Records, "[t]hese three factors led the Board to conclude that insufficient evidence exists to find that you were unfit at the time of your release from active duty."  A.R. 124.

Upon review of the material on which the decision was based, *see* A.R. 123 ("Documentary material considered by the Board consisted of your application, together with all material submitted in support thereof, relevant portions of your naval record and applicable statutes, regulations and policies."), the Court finds that even if it could quibble with aspects of the decision, there was a clear and rational connection between the facts found and the choice made, and that there is substantial evidence to support it.

Plaintiff takes issue with each of the individual findings.  He submits that the short duration of his Temporary Not Physically Qualified status simply suggests that his back injury – caused by

---

5    *See* July 20, 2004 Rating Decision, A.R. 309–10, explaining the criteria for rating diseases and injuries of the spine, with or without symptoms of pain, and the significance of range of motion in that determination.

the accident – experienced no improvement, but a reasonable factfinder could find that fact to be significant if his back injury was as disabling as plaintiff contends.  The record also reflects that during his Temporary Not Physically Qualified status, plaintiff regularly failed to provide the required medical documentation pertaining to his condition so the Marine Corps could properly evaluate his retention: he was sent a noncompliance letter for failure to do so every 30 days.  A.R. 311.  Thus, plaintiff can hardly complain about the limited nature of the information in the record on this point.

With respect to the VA's finding, plaintiff reminds the Court, accurately, that VA determinations are only one part of the picture when determining whether a service member can continue to perform his duties.  Pl.'s Cross–Mot. at 31.  But the Board's decision was expressly based on multiple factors, and a consideration of the entire record reveals that it did not view the VA opinion in a vacuum or give it undue weight.  *See* A.R. 123–24.  Moreover, a reasonable factfinder could find that the VA's rating decision of 10 percent was substantial evidence that plaintiff was not unfit for duty when he was released from active duty.

Finally, plaintiff contends that his decision to enter a combat zone for 15 months following his release from the Marine Corps Reserve in December 2003 has no probative value on the question of whether his condition prevented him from fulfilling military service obligations in December 2003.  Pl.'s Cross–Mot. at 32.  While that fact does appear to be more relevant with respect to the PTSD, the inclusion of that factor at all does not invalidate the entire decision; the reasoning might have been more persuasive if the Board had explained in more detail why his role or duties as a civilian contractor shed light on fitness for military service, but it is not as if the Board explicitly equated the two.  In the absence of medical evidence that plaintiff was compromised on the job by his condition, even in a different role, the Board could reasonably

37

consider plaintiff's ability to work all day supervising security officers on a military base to be a piece of relevant evidence, if not determinative on its own.

In any event, the determination was based on the three findings in combination and not any one in isolation. The decision is also consistent with both the expert opinions submitted to the Board and the VA's judgment as to how the disability should be characterized. For all of these reasons, the Court finds that the decision with respect to whether plaintiff's lumbar condition rendered him unfit was supported by substantial evidence.

Plaintiff also contends that the Board's determination that his PTSD did not render him unfit for service in December 2003 was not supported by substantial evidence. Pl.'s Cross–Mot. at 32–33. Again, he chafes at the Board's reliance on his willingness to enter a combat zone on two occasions in 2006 and 2007, and he disputes the relevance of his completion of an economics degree in 2011. *Id.*

But these were merely factors in a decision that was also based on the VA's rating – which plaintiff argued vociferously in the previous section of his brief should receive considerable weight – as well as his own clinical interviews. *See* A.R. 123–24, 126, 145–48. And with respect to the Board's emphasis on plaintiff's return to work, the Board's point was not that a civilian desk job could fairly be likened to the extreme psychological stress of combat; it was that plaintiff deemed himself ready to return to Iraq, in a combat zone. Even if there was also evidence of a lack of other options and diminished economic prospects, *see* A.R. 126, 150, it was not unreasonable or contrary to the evidence for the Board to include that fact in its overall analysis, and it is not up to the Court to balance the factors on its own. Moreover, plaintiff's ability to obtain an advanced degree relates directly to the factors identified by the VA in its Rating Decision. He was assigned a 50 percent evaluation based on, among other things, "[o]ccupational and social impairment with *occasional*

38

decrease in work efficiency and *intermittent* periods of inability to perform occupational tasks[,] *although generally functioning satisfactorily . . . . ,*" and not a higher percentage evaluation, since there was an absence of "occupational and social impairment, with deficiencies in most areas, such as work [and] school . . . ."  A.R. 325 (emphasis added).  The Board was permitted to assess and weigh the evidence presented before it, and because the decision "include[d] a rational connection between the facts found and the choice made," *Alpharma*, 460 F.3d at 6 (internal citation and quotation marks omitted), it will not be disturbed.

## V.       No Error or Injustice Was Present in the Record

Plaintiff's final argument is an amalgamation of all of the contentions the Court has already addressed.  He reasons that because the Board failed to address non-frivolous arguments and follow binding agency guidance under the Kurta Memo, it issued a decision unsupported by substantial evidence.  Pl.'s Cross–Mot. at 34–35.  And because that decision denies him medical disability retirement even though he meets the requirements of 10 U.S.C. § 1201(b), he contends that the Board failed to correct an injustice clearly present in the record.  *Id.* at 35.

Defendant moves for summary judgment in its favor on the grounds that the Board properly performed its duties in reviewing plaintiff's application.  Def.'s Cross–Opp. at 14.  The Board has the authority to deny an application if it cannot find the "existence of probable material error or injustice."  32 C.F.R. § 723.3(e)(1)–(2).  The Court's role is to defer to the Board's decision unless it was made without a rational basis.  *Frizelle*, 111 F.3d 172 at 176; *Havens v. Mabus*, 146 F. Supp. 3d 202, 220 (D.D.C. 2015).

After detailing its reasons, the Board determined that "no error or injustice exists" in plaintiff's case.  There is no dispute that plaintiff has suffered from back pain and restricted movement since the accident that occurred during his military service, and that his disability is not

39

the result of any misconduct or willful neglect on his part.  There is also no dispute that plaintiff suffers from, and has been diagnosed as disabled by, a very real and persistent psychological disorder, which also stems from his military service.  While the Court recognizes that plaintiff endured terrifying experiences when he was called up for active duty in service to his country in a combat zone, and that those experiences haunt and affect him today, it cannot find that the Board's decision was unsupported or unjust, or that it deviated from the applicable rules and Navy policies.  For all of the reasons set forth above, and applying the applicable standard on review, the Court finds that the Board's April 2, 2018 decision on reconsideration should be upheld.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment on all counts and its motion to dismiss in part, [Dkt. # 9], will be **GRANTED**, and plaintiff's motion for summary judgment, [Dkt. # 12], will be **DENIED**.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 13, 2026